IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**IN THE MATTER OF**
**THE COMPLAINT OF:**

**GRANTS PASS JETBOATS, INC.,**
as Owner of the "KELLY MARIE," a
1996 36' custom built vessel, for
Exoneration from or Limitation of Liability,

　　　　Petitioner.

Civ. No. 1:19-cv-01294-MC
**OPINION & ORDER**

**MCSHANE, U.S. District Judge**:

　　　　This case is before the Court on a Motion to Dismiss for Lack of Jurisdiction, brought by Claimant Dione Young. ECF No. 25. While on a jetboat excursion on the Rogue River, Claimant was injured when she was ejected from a jetboat and then struck on the head by another jetboat. Petitioner Grants Pass Jetboats, Inc. owned the jetboats. Petitioner brought this action seeking exoneration from or limitation of liability pursuant to 46 U.S.C. § 30501 *et seq*. ECF No. 1. Claimant moves to dismiss the petition for lack of admiralty jurisdiction.

　　　　Because the Rogue River constitutes navigable waters, and jetboating is sufficiently connected to traditional maritime activity, Claimant's Motion to Dismiss is DENIED.

## BACKGROUND

### I.　　The Rogue River

　　　　The Rogue River is a waterway in southwestern Oregon. Hamlyn Decl. Ex. B, at 1. It flows for 215 miles from its headwaters near Crater Lake National Part to the Pacific Ocean at

Gold Beach, Oregon.  *Id.*  The Rogue River does not intersect with other rivers between its headwaters and its terminus.  Hoobyar Decl. ¶ 5.

Two features of the river are significant for purposes of this case.  The first is Blossom Bar Rapids, located at River Mile 45.5. [1]  Hoobyar Decl. ¶¶ 9, 15.  Blossom Bar Rapids is classified as a Class IV rapid and is considered "a technically difficult set of rapids due to the obstructions and constrictions in the river channel that are created by multiple boulders," as well as tight passages and a drop in elevation between the top and bottom of the rapids  *Id.* at ¶ 11.  Under typical conditions, experienced boaters can navigate in a channel around the rocks or along the riverbanks.  Ely Decl. ¶ 12.  During periods of high water, the rocks become submerged and boaters can safely navigate over them.  *Id.*

The other significant feature is Rainie Falls, located at River Mile 66.5.  Hoobyar Decl. ¶ 14.  Rainie Falls is a twelve-foot drop at normal summer flows.  *Id.*  Raine Falls is not a sheer cliff, but a "chute," and the drop in elevation occurs over a length of thirty to forty feet.  Ely Decl. ¶ 9.  When the water level is high enough, Raine Falls has no appreciable drop in elevation and motorized boats can navigate through it "without noticing it."  *Id.* at ¶ 10.  Rainie Falls does not span the width of the river and can be bypassed by traveling through an adjacent "lining chute," which is less steep than Rainie Falls.  *Id.* at ¶ 11.  "Under typical conditions, motorized boats can easily navigate this alternative route to Rainie Falls."  *Id.*

In May 2008, the Oregon Department of State Lands issued a navigability report for an 89-mile segment of the Rogue River from River Mile 68.5 to River Mile 157.5  Hamlyn Decl. Ex. D, at 1.  Historically, the river "has been used in a variety of ways both before and since

---

[1]  The "River Mile" designation is used to identify approximate locations on the Rogue River, with the river mouth at Gold Beach designated as River Mile 0.  The city of Grants Pass is located at approximately River Mile 101.  Hoobyar Decl. ¶4.

statehood," including "Indian canoe and raft use; cable ferries; the transport of people and goods on boats; as a mode of transport for logs; and various recreational watercraft." *Id.* at 3. "Wooden boats were used from the late 1890s to the early 1900s to transport goods and people primarily from Grants Pass to various points downriver," including to Gold Beach at the river mouth. *Id.* at 64. The report concluded that, at the time of Oregon's statehood, the relevant section of the Rogue River "was used or susceptible to being used in its ordinary and natural condition as a highway of commerce over which trade and travel could have been conducted in the customary modes of trade and travel at that time." *Id.* at 4.

The U.S. Coast Guard has determined, for purposes of Coast Guard authority and jurisdiction, that the Rogue River is navigable from the mouth of the river to the city of Grants Pass at River Mile 101.2. Hamlyn Decl. Ex. E, at 1, 12.[2]

## II.     The Wild and Scenic Rivers Act

The Rogue River is designated as a component river in the Wild and Scenic Rivers Act, 16 U.S.C. § 1274(5), and a portion of the river is managed by federal agencies under the Act. Hamlyn Decl. Ex. B, at 1. The purpose of the Wild and Scenic Rivers Act was to establish that certain rivers possessing "outstanding remarkable scenic, recreational, geological, fish and wildlife, historical, cultural, or otherwise similar values," should be preserved "in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271. The Act divides the covered rivers, or sections of rivers, into three classifications:

---

[2] The Court notes that the Coast Guard's navigability determination was made "for the purposes of exercising Coast Guard authority and jurisdiction only," and "should not be construed as determinative of jurisdiction under admiralty and general maritime law, state law, or for jurisdiction by other federal agencies (such as the Army Corps of Engineers)." Hamlyn Dec. Ex. E, at 1.

3 – OPINION AND ORDER

 (1) Wild River Areas, which "are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted.";

 (2) Scenic River Areas, which are "free of impoundments, with shorelines and watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads," and

 (3) Recreational River Areas, which are "readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past."

16 U.S.C. § 1273.

 Portions of the Rogue River were designated under the Act with all three classifications on different sections of the river. Hoobyar Decl. ¶ 7. The section of the river between Grave Creek, at approximately River Mile 68.5 and the Blossom Bar Rapids are designated as a "Wild River Area." *Id.* at ¶ 9. The Wild section of the river is subject to regulated use and commercial boating permits are required year-round. Hamlyn Dec. Ex. B, at 3. In 2019 a total of 12,467 people floated the Wild section of the Rogue River between May 15 and October 15. Hamelyn Decl. Ex. C, at 2. Commercial use totaled 5,895 people, while non-commercial use totaled 6,572 people. *Id.*

### III. The Incident

 Petitioner Grants Pass Jetboats, Inc. was established in 1959 and is one of several jetboat excursion companies operating on the Rogue River. Hamlyn Decl. ¶ 2. Petitioner's jetboat tours begin in Grants Pass and travel between 36 and 75 miles on the river. *Id.* The jetboat involved in this case was the "Kelly Marie," a 36-foot vessel powered by three engines and certified to carry up to 59 passengers. *Id.* ¶ 4.

On July 20, 2018, Claimant Dione Young and her family went on a jetboat tour aboard the "Kelly Marie." Dione Young Decl. ¶ 3-4. Claimant was ejected from the "Kelly Marie" while the jetboat was performing high-speed turns. *Id.* ¶¶ 5-6. While she was in the water, Claimant was struck and seriously injured by another jetboat owned by Petitioner. Jeff Young Decl. ¶ 9. Members of Claimant's family dove into the river to rescue her. *Id.* at ¶ 10. Claimant was brought back into the boat and passengers rendered first aid until an ambulance arrived to take her to a hospital. *Id.* ¶¶ 10-13.

The incident occurred at approximately River Mile 92. Hoobyar Decl. ¶ 17. This area is designated as a Recreational River Area under the Wild and Scenic Rivers Act. *Id.* The site of the incident is upstream from Blossom Bar Rapids and Rainie Falls and is also upstream of the portion of the river designated as a Wild River Area. *Id.* at ¶¶ 13-15.

## LEGAL STANDARD

Federal courts have original subject matter jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). A party may move to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

> A Rule 12(b)(1) jurisdictional attack may be facial or factual. In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted).

When determining the existence of subject matter jurisdiction, the court accepts the factual allegations in the complaint as true. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). When the jurisdictional attack is factual, however, "the court may review extrinsic evidence without converting the motion to a motion for summary judgement and the court 'need

not presume the truthfulness of the plaintiff's allegations.'" *All. For the Wild Rockies, Inc. v. U.S. Army Corps of Engineers*, 237 F. Supp. 3d 1079, 1082 (D. Or. 2017) (quoting *Safe Air for Everyone*, 373 F.3d at 1039). The moving party converts the motion to dismiss into a factual motion by providing affidavits and other evidence, and the opposing party must then provide affidavits and other necessary evidence to satisfy its burden of establishing subject matter jurisdiction. *Safe Air for Everyone*, 373 F.3d at 1039.

## DISCUSSION

Claimant moves to dismiss the petition for lack of jurisdiction pursuant to Rule 12(b)(1). Federal courts have original subject matter jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). A party invoking admiralty jurisdiction over a tort claim must establish: (1) "whether the tort occurred on navigable water," and (2) whether the tort has a "connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (internal quotation marks and citation omitted).

Claimant contends that the section of the Rogue River where the incident occurred is not navigable and that the incident was not sufficiently connected to traditional maritime activity.

### I. Navigability

"Whether a river is navigable is a federal question." *Alaska v. Ahtna, Inc.*, 981 F.2d 1401, 1403 (9th Cir. 1989). Rivers "are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *The Daniel Ball*, 77 U.S. 557, 563 (1870). Navigability does not hinge on a particular manner or extent of use or on the absence of "occasional difficulties in navigation," but rather on whether "the stream in its natural and ordinary condition affords a channel for useful commerce." *United States v.*

*Holt State Bank*, 270 U.S. 49, 56 (1926) (citing *The Montello*, 87 U.S. 430, 441 (1874)); *see also Econ. Light & Power Co. v. United States*, 256 U.S. 113, 122 (1921) ("Navigability, in the sense of the law, is not destroyed because the water course is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water.").

In *Adams v. Montana Power Co.*, 528 F.2d 437 (9th Cir. 1975), the Ninth Circuit considered whether a twenty-five mile stretch of river completely obstructed by a dam at either end constituted a navigable waterway. *Id.* at 439. The court applied the *Daniel Ball* test to determine navigability, noting that a waterway is navigable "provided that it is used or susceptible of being used as an artery of commerce." *Id.* The court adopted a narrow definition of commerce as "activities related to the business of shipping," and held that "[n]either non-commercial fishing nor pleasure boating nor water skiing constitutes commerce." *Id.* As no such commercial activity was possible on the river due to the presence of the dams, the court concluded that the river was not navigable. *Id.* at 440-41.

In *State of Alaska v. Ahtna, Inc.*, 891 F.2d 1401 (9th Cir. 1989), the Ninth Circuit took a more expansive view of commercial activity. In that case, the issue was whether a section of the Gulkana River had been navigable at the time of Alaska's statehood and was, therefore, property of the state. *Id.* at 1402. As in *Adams*, the court applied the *Daniel Ball* test for navigability. *Id.* at 1404. In applying that test, the court held that "[i]t is not essential that the river be used for the transportation of water-borne freight by a carrier whose purpose is to make money from the transportation," nor it is "even necessary that commerce be in fact conducted." *Id.* The court noted that a "substantial industry" of guided fishing and sightseeing trips with watercraft had grown up along the river and employed hundreds of people. *Id.* at 1405. "To deny that this use

of the River is commercial because it relates to the recreation industry is to employ too narrow a view of commercial activity. Navigability is a flexible concept and each application of the *Daniel Ball* test is apt to uncover variations and refinements which require further elaboration." *Id.* (internal quotation marks and citations omitted, alterations normalized).

In the present case, the circumstances on the Rogue River are more comparable to those described in *Alaska* than to the dammed-off river in *Adams*. The *Alaska* court cautioned that courts should not take too narrow a view of "commercial activity," and the record in this case supports the conclusion that, like the Gulkana River, the relevant portions of the Rogue River support a local industry of guided fishing and sightseeing tours. *See, e.g.*, Thorp Decl. ¶ 2 ("I take paying passengers on drift boat fishing trips on the . . . Rogue River in Oregon."); Hamblyn Decl. Ex. B, at 1 ("Visitors may experience the river as a private, self-guided group or as passengers of a fully outfitted commercially guided trip."). Consistent with the *Alaska* decision, the Court concludes that the relevant portions of the Rogue River are used for commercial activity and, more to the point, are susceptible to commercial use.

Claimant argues that Blossom Bar Rapids and Rainy Falls prevent navigation of the river. Occasional navigational difficulties do not destroy navigability. *Econ. Light & Power Co.*, 256 U.S. at 122 ("Navigability . . . is not destroyed because the watercourse is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water"). For the purposes of admiralty jurisdiction, navigational difficulties only render the river non-navigable if they have "the practical effect of eliminating commercial maritime activity." *Adams*, 528 F.2d at 440. In this case, Petitioner has provided declarations from mariners who affirm that they have navigated both Blossom Bar Rapids and Rainie Falls in motorized boats going upstream and downstream. Thorp Decl. ¶ 4; Stichter Decl.

¶¶ 5-6; Ely Decl. ¶ 7.  The same declarants affirm that they have navigated the length of the Rogue River from Grants Pass to Gold Beach and back in motorized vessels or were passengers on vessels that made the trip.  Thorp Decl. ¶ 5; Stichter Decl. ¶ 5; Ely Decl. ¶ 8.  On this record, the Court concludes that, unlike the dams in *Adams*, neither Blossom Bar Rapids nor Rainie Falls renders the Rogue River non-navigable for purposes of establishing jurisdiction.

      Claimant also contends that the restrictions imposed by the Wild and Scenic Rivers Act serves to render the portions of Rogue River upstream of the section designated as a Wild River Area non-navigable.  While the Act's designation of a section the Rogue River as a Wild River Area limits the number of vessels permitted to operate during certain seasons and places restrictions on commercial activities in the area, the Act does not have the practical effect of eliminating commercial maritime activity related to the recreation industry.  Ely Decl. ¶ 5; Stichter Decl. ¶ 4.  The 2019 Wild Rogue River Use Report establishes that, from May 15, 2019 to October 15, 2019, a total of 5,895 commercial users entered the Wild River Area.  Hamlyn Decl. Ex. C, at 2.  Although the parties dispute whether the Act prohibits commercial motorized boats in the Wild River Area, a variety of other non-motorized vessels use this area for commercial recreational activities.  Hamlyn Decl. ¶ 2.  The Court therefore concludes that the restrictions on use of the Wild River Area does not destroy the navigability of the Rogue River.

      Courts may also consider determinations of navigability made by state governments and federal agencies like the Coast Guard, although such determinations are not dispositive.  *See Sawczyk v. U.S. Coast Guard*, 499 F. Supp. 1034, 1039 (W.D. N.Y. 1980) ("Although these determinations are not controlling, they are not without significance and may be taken into account by the court in determining whether the Niagara is navigable.").  As previously noted, the Coast Guard found that the relevant portions of the Rogue River are navigable.  Hamlyn

Decl. Ex. E, at 12.  The Oregon Department of State Lands found that, as early as the 1890s, the Rogue River was used to transport goods and people from Grants Pass to Gold Beach.  Hamlyn Decl. Ex. D, at 64.

In sum, the Court concludes that the incident occurred on a navigable waterway for purposes of admiralty jurisdiction.

## II. Connection to Traditional Maritime Activity

Courts makes two inquiries to determine whether an incident is sufficiently connected to traditional maritime commerce.  First, a court must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce.  *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1126 (9th Cir. 2009).  "Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."  *Id.* (internal quotation marks and citation omitted).

In *Mission Bay Jet Sports*, the Ninth Circuit found that a passenger thrown off and injured by a jet-propelled personal watercraft in navigable waters could potentially disrupt maritime commerce because the incident would likely result in search and rescue efforts, calls for assistance from others, and would "ensnarl maritime traffic in the lanes affected."  *Mission Bay Jetsports*, 570 F.3d at 1129.  The general character of the incident in the present case has the potential to disrupt maritime commerce for many of the same reasons.  As discussed above, the incident directly involved a second jetboat, which struck Claimant after she went overboard, and several jetboat passengers dove into the water to rescue Claimant.  Claimant's injuries were severe enough that emergency services were called, and Claimant was transported to the

hospital.  The Court concludes that, as in *Mission Bay Jet Sports*, the incident had the potential to disrupt maritime commerce.

As to the second inquiry, the Ninth Circuit has held that "[v]essels have traditionally carried passengers across navigable waters," and that "operating a vessel in navigable waters . . . clearly falls within the substantial relationship" to traditional maritime activity.  *Mission Bay Jet Sports*, 570 F.3d at 1129.  The same reasoning is readily applicable to the present case.  The jetboat was clearly a vessel and, as discussed in the previous section, it was carrying passengers in navigable waters.  The Court therefore concludes that the incident was sufficiently related to traditional maritime activity to satisfy the requirements of admiralty jurisdiction.

## CONCLUSION

For the reasons set forth above, the standards for the exercise of admiralty jurisdiction are satisfied and Claimant's Motion to Dismiss, ECF No. 25, is DENIED.

It is so ORDERED and DATED this 5th day of October 2020.

    _s/Michael J. McShane_____
    **Michael J. McShane**
    **United States District Judge**